**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Michael Rodeski,<br><br>Plaintiff,<br><br>v.<br><br>Jim McDonald, et al.,<br><br>Defendants. | No. CV 16-03372-PHX-DGC (BSB)<br><br>**ORDER** |

Plaintiff Robert Michael Rodeski, who was previously confined in CoreCivic's La Palma Correctional Center (LPCC) in Eloy, Arizona, brought this civil rights case pursuant to 42 U.S.C. § 1983.[1] (Doc. 7.) Before the Court are Defendants' Motion for Summary Judgment (Doc. 44) and Defendants' Motion for Summary Disposition of their Motion for Summary Judgment (Doc. 47). Although the Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response (Doc. 46), Plaintiff did not respond to either motion. The Court will deny the Motion for Summary Disposition, grant the Motion for Summary Judgment, and terminate this action.

**I.    Background**

In his two-Count First Amended Complaint, Plaintiff alleged that he was subjected to excessive force and denied constitutionally adequate medical care. (Doc. 7.) On

---

[1] Plaintiff is a former California Department of Corrections and Rehabilitation inmate who was released around March 12, 2018. (Doc. 7 at 1; Doc. 39 at 1.)

1 screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment medical care claim and directed Captain Bobertz, Sergeant Slaughter, and Correctional Officer (CO) Messer to answer.[2] (Doc. 9, 10.) The Court dismissed the remaining claims and Defendants. (*Id.*)

**II.    Motion for Summary Disposition**

In their Motion for Summary Disposition, Defendants ask the Court to summarily grant their pending Motion for Summary Judgment because Plaintiff failed to file a response. (Doc. 47.) Defendants rely in part on Local Rule of Civil Procedure 7.2(i), which provides that the Court may deem a party's failure to respond to a motion as consent to the granting of the motion. (*Id.*) In *Heinemann v. Satterberg*, the Ninth Circuit clarified that a local rule permitting a district court to treat the lack of a response as consent to granting a motion does not apply to summary judgment motions. 731 F.3d 914, 917 (9th Cir. 2013). If a summary judgment motion is unopposed, Rule 56 "authorizes the court to consider a fact as undisputed," but does not permit the court to grant summary judgment by default. *Id.* Indeed, under the summary judgment standard, if the moving party fails to meet its initial burden of production, the opposing party need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). The Court must therefore address Defendants' Motion for Summary Judgment on the merits, and will deny Defendants' Motion for Summary Disposition.

**III.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion

---

[2] Plaintiff spelled Bobertz's name as "Boberts," but Defendants spelled this Defendant's name as "Bobertz" in their answer (Doc. 15) and thereafter. The Court will use the spelling provided by Defendants.

and identifying portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire*, 210 F.3d at 1102-03. But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court is required to consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**IV.    Relevant Facts[3]**

On July 31, 2015, Defendant Bobertz was the Shift Captain for the third shift; Defendant Slaughter was a third-shift sergeant assigned to the TEWA Unit; and

---

[3] Because Plaintiff failed to respond to Defendants' Motion for Summary Judgment or provide a separate Statement of Facts, the Court will consider Defendants' facts undisputed unless they are clearly contradicted by Plaintiff's first-hand allegations in the verified First Amended Complaint. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

Defendant Messer was a third-shift CO assigned to the TEWA Unit. (Doc. 45 (Defs.' Statement of Facts) ¶¶ 2-4.) That day, the LPCC Special Operations Response Team ("SORT") conducted an operation in the TEWA unit in order to search specific cells, including Plaintiff's, for drugs or contraband. (*Id*. ¶¶ 6, 8-9.) During a SORT operation, SORT "typically has authority over the area and inmates within that area in order to maintain consistency and control during the operation," and non-SORT employees "are to defer to the SORT Commander and SORT members during an operation." (*Id*. ¶ 7.)

During the July 31, 2015 SORT operation, SORT entered each cell and each inmate was cuffed behind his back using "flex cuffs," which are plastic wrist restraints that resemble zip ties. (*Id*. ¶ 9.) Each inmate was then taken to a hallway where they passed through a metal detector and, once cleared, brought into a multi-purpose room where they were seated on a chair backwards with the inmate's chest facing the back of the chair. (*Id*. ¶¶ 10-11.) Once all inmates were in the multi-purpose room, SORT began its operation searching the cells, and Defendant Messer monitored the inmates in the multi-purpose room. (*Id*. ¶¶ 11-12.)

Messer notified Bobertz and Slaughter that several inmates, including Plaintiff, were complaining that their cuffs were too tight and hurting their hands, but Messer, Bobertz, and Slaughter were non-SORT employees and "did not have authority to remove, loosen, tighten or readjust [Plaintiff's] flex cuffs at that time." (*Id*. ¶¶ 12-13.) Bobertz informed the Assistant SORT Commander that Plaintiff was complaining that his cuffs were too tight, and members of SORT took Plaintiff into the hallway and loosened his flex cuffs. (*Id*. ¶ 14.)[4] Bobertz, Slaughter and Messer were not "made aware that

---

[4] Defendants also assert that Plaintiff "was asked whether he wanted to be seen by medical staff, but he refused," and Plaintiff was taken back into the multipurpose room and seated in a chair. (Doc. 45 ¶ 14.) As support, Defendants cite to Bobertz's Declaration, but Bobertz does not say if he was in the hallway with the SORT members or who asked Plaintiff if he wanted to be seen by medical. As such, Bobertz fails to establish that this assertion in his Declaration is based on his personal knowledge; therefore the Court cannot consider this evidence. *See* Fed. R. Civ. P. 56(c)(4) (sworn statement used to support summary judgment motion must be made on personal

[Plaintiff] had suffered any sort of injury during SORT's operation" or that Plaintiff requested medical attention either during or after the SORT operation. (Doc. 45 ¶ 19.)

According to Plaintiff, at 3:30 a.m. on July 31, 2015, two officers woke him up and told him to lie on the floor. (Doc. 7 at 5.) Plaintiff was handcuffed behind his back, yanked to his feet, and escorted to a multi-purpose room. (*Id*.) Plaintiff was then dropped into a chair, causing his cuffed hands to hit the chair back. (*Id*.) Plaintiff immediately felt a sharp, throbbing pain in his right hand. The injury occurred either while he was being restrained and lifted up or when he was dropped into the chair. (*Id*.)

Plaintiff informed Defendant Messer that something was wrong with his right hand and that he needed medical attention, but Messer replied that "this is just a drill," "turn around and shut-up." (*Id*. at 6.) Plaintiff showed Messer his right hand, which was red and swollen, and Messer said "yes, it is swollen and red but that's just because you are fighting your cuffs." (*Id*.) Plaintiff said again that he needed medical attention and Messer again said "no." (*Id*.)

Messer left the room, and Plaintiff asked Defendant Bobertz if he could see medical and told SORT members that something was wrong with his hand. (*Id*.) Later that morning, SORT members escorted Plaintiff into a hallway and examined his hand. (*Id*.) They told Plaintiff that the swelling and discomfort in his right hand was normal and would go away after the cuffs were removed. (*Id*.) Plaintiff again asked for someone from the medical department to look at his hand, but was told by SORT that Bobertz had denied the request. (*Id*.) Upon being returned to the multi-purpose room, Plaintiff asked Defendant Slaughter how he could get medical attention for his hand. (*Id*.) Slaughter

---

knowledge); *cf. Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412-13 (9th Cir. 1995) (declaration by declarant without personal knowledge are entitled to no weight); *Aguilar v. Kuloloia*, No. 2:06-CV-01002-KJD-PAL, 2007 WL 2891503, at *9 (D. Nev. Sept. 28, 2007) ("affidavits in support of a motion for summary judgment require more than a prison officer's pledge of good intentions; such affidavits must demonstrate personal knowledge of the events to preclude a finding that material issues of fact exist with respect to the claim.).

told him to fill out a medical request, which Plaintiff did once he was returned to his cell. (*Id*. at 7.)

According to Defendants, during a SORT operation, LPCC policy requires that medical staff be called immediately if an inmate complains of a life-threatening injury or condition, but if the complaint is non-life threatening, "it is appropriate for an inmate to be told to fill out a Sick Call Request form," especially during third shift when there are fewer medical staff on the premises. (Doc. 45 ¶¶ 22-23.) That is because "[t]he ability for SORT to maintain control and consistency over a SORT operation is paramount, particularly where, as here [il]licit and illegal drugs were found on [Plaintiff's] bunk." (*Id*. ¶ 25.) During a SORT operation, "any movement of inmates to medical for non-life-threatening injuries could have posed a great risk to the security of the facility and to the safety of inmates and employees" because it would take staff away from the operation, the inmate could create a disturbance that could detract from the investigation, or the inmate could disseminate information to other inmates throughout the facility about the operation. (*Id*. ¶¶ 26-27.)

On August 2, 2015, Plaintiff submitted a Sick Call Request form asserting that "I put a Sick Call in on 7-31. During a search, I had zip ties placed on my wrist and I felt severe pain in my r[igh]t hand pinkie."[5] (*Id*. ¶ 37; Doc. 45-6 at 10.) LPCC medical staff received the Sick Call Request on August 3, 2015 at 10:30 p.m., and Plaintiff saw Registered Nurse Clark on August 4, 2015, at 8:50 a.m. Clark noted that there was swelling present on Plaintiff's right pinky and that he was unable to flex it fully. (Doc. 45 ¶ 40.) Clark consulted with Dr. Giovino, who determined the injury did not require immediate attention "[b]ecause there was no mechanism of injury" and because of Plaintiff's "reported minimal pain level." (*Id*. ¶ 42.) Dr. Giovino ordered an x-ray and recommended that Plaintiff apply ice to his finger three times a day for three days and

---

[5] Defendants assert that there is no record that Plaintiff submitted a Sick Call Request on July 31, 2015 or that LPCC medical staff received a Sick Call Request from Plaintiff prior to the August 2, 2015 request. (Doc. 45 ¶ 39.)

- 6 -

avoid excessive use of his right hand for three days. (*Id.* ¶ 43.) Plaintiff was directed not to flex or extend his hand until the x-ray was completed. (*Id.*)

Plaintiff's right hand was x-rayed the morning of August 6, 2015, a nurse notified Dr. Giovino that the x-ray was positive for a dislocation of Plaintiff's "PIP proximal phalangeal joint," and Dr. Giovino immediately ordered that Plaintiff be taken off-site to the Emergency Room (ER) at Banner Casa Grande Medical Center. (*Id.* ¶¶ 44, 46.) The ER could not reset Plaintiff's dislocated pinky finger due to probable "buttonholing of phalanx into volar plate" and recommended that Plaintiff be referred to a hand surgeon. (*Id.* ¶ 47; Doc. 45-7 at 21.) Upon his return to LPCC from the ER, Plaintiff saw RN Menghini and was given ibuprofen, and Dr. Giovino ordered that Plaintiff be placed on the bottom bunk and restricted from working at his job in the kitchen for 2 weeks. (Doc. 45 ¶ 48.) On August 7, 2015, Nurse Practitioner Goulding prescribed an analgesic balm external ointment and ibuprofen to Plaintiff, and on August 9, 2015, Dr. Giovino prescribed ice for one week and ibuprofen for 30 days. (*Id.* ¶¶ 49-50.)

On August 12, 2015, Plaintiff was taken off-site for a consultation with Dr. Joseph Haber, M.D., an orthopedic hand surgery specialist. (*Id.* ¶ 51.) "It was reported that Dr. Haber was able to reduce [Plaintiff's] pinky (reset the finger into the joint) at that appointment, and x-rays taken at the appointment showed that his PIP joint was congruent." (*Id.* ¶ 52.) Dr. Haber recommended that Plaintiff have an MRI and remain in a finger splint for six weeks. (*Id.*) On August 15, 2015, Plaintiff went to medical to have his bottom bunk order renewed, but he was not wearing his finger splint and was instructed to wear the splint as ordered and continue his current plan of care. (*Id.* ¶ 53.)

Plaintiff saw Dr. Giovino on August 19, 2015 for a follow-up examination of his pinky finger, and reported that he felt well, had no numbness or tingling, and had experienced no pain since shortly after the dislocation was reduced by Dr. Haber. (*Id.* ¶ 54.) Dr. Giovino recommended that Plaintiff continue splinting his pinky finger for six weeks, ordered a work restriction for two months, and ordered an MRI. (*Id.*)

On August 31, 2015, Plaintiff went to medical asking for a release from his work restriction. (*Id.* ¶ 55.) At that time, Plaintiff complained of pain in his right ear, but did not complain of pain in his pinky finger and he was not wearing his finger splint. (*Id.*) Nurse Struebing instructed Plaintiff to continue to follow Dr. Giovino's and Dr. Haber's orders and recommendations regarding splinting and work restrictions. (*Id.*) Struebing then contacted the kitchen officer, "who indicated that [Plaintiff] did not have work restrictions and had voluntarily been working in the kitchen throughout this time." Struebing informed the kitchen officer that Plaintiff "was to remain on work . . . restriction for two months, as per Dr. Giovino's order, and was to have his pinky finger splinted for six weeks."[6] (*Id.*)

On September 3, 2015, Plaintiff was taken off-site to AZ-Tech Radiology where he had an MRI of his right hand. (*Id.* ¶ 56.) On September 18, 2015, Plaintiff asked to stop wearing the splint so he could go back to work, and Nurse Practitioner Goulding told him he could stop wearing the splint, but recommended that he tape his finger while

---

[6] This fact relies on Dr. Giovino's Declaration and Progress Notes in Plaintiff's medical records, which were written by Nurse Struebing. (Doc. 45-7 at 5 ¶ 21; Doc. 45-7 at 14.) Giovino states in his Declaration that on August 31, 2015, "Nurse Struebing contacted the kitchen officer, who indicated that [Plaintiff] had been working in the kitchen throughout this time." (Doc. 45-7 at 5 ¶ 21, citing Att. B, Progress Notes dated Aug. 31, 2015.) Defendants do not provide a Declaration by Struebing about her conversation with the kitchen officer, and the August 31, 2015 Progress Notes only state "spoke with kitchen officer, stated didn't have work restriction chrono's listed in kitchen, verbally informed that inmate has plan 6 weeks of splinting right hand, work and activity restriction plan for 2 months, chrono's done by Dr Giovino on 8/19/2015." (Doc. 45-7 at 14.) Therefore, Defendants' assertion that Plaintiff "had voluntarily been working the kitchen throughout this time" is unsupported by the evidence and the Court will not consider this evidence. Material in a form not admissible in evidence, but which could be produced in a form admissible at trial, may be used to *avoid*, but not *obtain* summary judgment. *See Quanta Indemnity Co. v. Amberwood Dev. Inc.*, No. CV 11-1807-PHX-JAT, 2014 WL 1246144, at *2 (D. Ariz. March 26, 2014) (citing cases). "Because verdicts cannot rest on inadmissible evidence and a grant of summary judgment is a determination on the merits of the case, it follows that the *moving* party's affidavits must be free from hearsay." *Id.* (internal quotation omitted) (emphasis in original).

working. (*Id.* ¶ 57.) Plaintiff did not submit any further complaints about his finger and was never treated for his finger again. (*Id.* ¶ 58.)

After Plaintiff informed LPCC medical staff on August 6, 2015 that he was injured during the SORT operation, LPCC began an internal investigation. (*Id.* ¶ 66.) On August 11, 2015, Plaintiff filed a complaint against staff, and LPCC conducted a fact-finding inquiry and investigation. (*Id.* ¶¶ 67-68.) LPCC investigator Melendrez interviewed employees present during the SORT operation, including Defendant Bobertz and Lieutenant Freeman, who prepared 5-1C Incident Statements.[7] (*Id.* ¶ 69.)

On March 19, 2016, Plaintiff submitted an Inmate Request to CO Paini asking if Paini recalled "when [Plaintiff] made [Paini] aware of an injury to [his] hand during yard in or around 7.14.15? Did I need medical assistance? Was this incident before the SORT search on 7.31.15[?]" (*Id.* ¶ 74; Doc. 45-1 at 9.) Paini responded, "Yes, I do recall when you came off of the rec yard on approximately 7-14-15 and made me aware that you had injured your hand at rec. I asked if you needed medical attention & you said no, so I sent you back to your pod. Yes, this incident on the rec yard was before the SORT searches, those happened approximately 2-3 weeks later." (Doc. 45-1 at 9.)

## V. Eighth Amendment Legal Standard

Under the Eighth Amendment, a prisoner must demonstrate that a defendant acted with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091,

---

[7] Defendants' facts about the internal investigation and Plaintiff's staff complaint all rely on the Declaration of Assistant Warden J. Jackson, who never states that he was involved in the investigation, that he reviewed the documents he discusses in his Declaration, and he does not provide the documents he discusses such as Plaintiff's staff complaint or the Incident Statements prepared by other staff members. (*See* Doc. 45 ¶¶ 68-74; Doc. 45-1 at 6-7 ¶¶ 24-29.) For example, Jackson states that Case Manager Lazcano submitted a 5-1C Incident Statement stating that sometime between July 6 and July 14, 2015, Plaintiff and his cellmate walked into her office and Plaintiff said he hurt his right pinky while playing basketball and Lazcano observed Plaintiff's pinky "as very swollen." (Doc. 45-1 at 6 ¶ 25.) Jackson did not include Lazcano's Incident Statement and Defendants did not provide a Declaration from Lazcano. As such, Defendants' facts about the investigation into Plaintiff's complaints lack foundation or are otherwise based on inadmissible evidence and the Court will not consider such evidence.

- 9 -

1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective prong and a subjective prong. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096.

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

/ / /

/ / /

## VI. Discussion

### A. Serious Medical Need

Defendants argue that Plaintiff cannot establish a serious medical need because "there is no evidence that Plaintiff injured his right pinky during the July 31, 2015 SORT operation instead of during a basketball game on the recreation yard sometime in the second or third week of July 2015." (Doc. 44 at 11, citing Doc. 45 ¶¶ 12, 14, 15, 18-20, 29, 70, 72-74.) Defendants contend that Plaintiff's complaints during the SORT operation "stemmed from the tightness of his flex cuffs rather than pain in his right pinky," and that when SORT members adjusted the flex cuffs, they offered him medical attention, but he refused. (*Id*., citing Doc. 45 ¶¶ 12, 14.)

The Court has already noted that Jackson's Declaration about the mid-July pinky injury is based on hearsay, which is inadmissible when presented by a party moving for summary judgment. Also, Defendants' evidence that Plaintiff refused medical attention during the SORT operation is based on Bobertz's Declaration which fails to show he had personal knowledge of Plaintiff's interaction with the SORT members in the hallway.

Defendants also argue that Plaintiff's injury was not a life-threatening or serious medical condition. (Doc. 44 at 12.) They assert that Plaintiff's medical records do not evidence any chronic and substantial pain and "show that any pain he may have experienced was 'minimal' and effectively treated with Ibuprofen and was fully resolved within two weeks, shortly after his August 12, 2015 appointment with Dr. Haber." (*Id*.) They therefore argue that the evidence proves that Plaintiff "did not suffer a serious medical injury." (*Id*., citing *Delaney v. Marsh*, No. 1:10CV388(CMH/TCB), 2010 WL 2132069, at *4 (E.D. Va. May 21, 2010 ("It is doubtful that a broken or dislocated finger which admittedly has been treated is a 'condition' of urgency' which would support an Eighth Amendment violation.")

Defendants do not cite any authority in this Circuit holding that a dislocated finger cannot support an Eighth Amendment violation. After the SORT operation, Plaintiff had x-rays, an MRI, went to the ER, and was treated by a hand surgeon, indicating that

Plaintiff's condition was "worthy of comment or treatment." *See McGuckin*, 974 F.2d at 1059-60. Based on this record, there is at least a question of fact whether Plaintiff had a serious medical need.

### B. Deliberate Indifference

The evidence in the record supports that Plaintiff's initial treatment for his dislocated finger was delayed, at most, by four days, and possibly only by two days since Plaintiff has not rebutted Defendants' evidence that he did not submit a Sick Call Request until August 2, 2015. While a delay in medical care may show that a defendant was deliberately indifferent, a plaintiff must demonstrate that he was harmed by the indifference. *See Jett*, 439 F.3d at 1096; *Hunt*, 865 F.2d at 200; *McGuckin*, 974 F.2d at 1060 (holding that "[w]hen, as here, a claim alleges 'mere delay of surgery,' a prisoner can make 'no claim for deliberate medical indifference unless the denial was harmful'") (quoting *Shapely v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)).

Plaintiff has presented no evidence that he was harmed, and the record fails to support that he was harmed, by the few-days delay. Although Plaintiff asserts in his First Amended Complaint that he was told at the ER that "due to the delay in treatment that [he] would have to see an expert because [his] injury had 'button-holed'" (Doc. 7 at 7), this statement is too vague and conclusory to create a genuine issue of material fact. *See, e.g., Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact") (citation omitted). For example, Plaintiff does not say who told him the delay necessitated the use of an expert rather than ER personnel, and Plaintiff has not presented any records of his ER visit showing that the ER could not treat his finger due to a delay caused by Defendants. The only evidence in the record regarding the ER visit are the Progress Notes made upon Plaintiff's return from the ER by Nurse Menghini, which include the follow notation: "Record Review: 'Your dislocated finger cannot be reduced today in the emergency room. Probable cause,

buttonholing of phalanx into volar plate. You will need to have you[r] medical clinic arrange evaluation and treatment by a hand surgeon. This will most likely require operative reduction.'" (Doc. 45-7 at 21.) This record does not say that a delay in treatment prevented the ER from treating the dislocated finger.

Moreover, Plaintiff has presented no evidence that he has suffered ongoing pain or other problems related to his finger injury. Defendants have presented unrebutted evidence that Plaintiff's pain was treated with ibuprofen, ice, and analgesic balm before August 12, 2015, when Dr. Haber reset his pinky, and that by August 19, 2015, Plaintiff was reporting to Dr. Giovino that he felt well, had no numbness or tingling, and had experienced no pain since shortly after the dislocation was reset by Dr. Haber on August 12, 2015. (Doc. 45 ¶¶ 48-50, 54.) Nor has Plaintiff rebutted Defendants' evidence that on September 18, 2015, he asked to stop wearing the splint so he could go back to work, that he did not submit any further complaints about his finger, and he was never treated for his finger again. (*Id.* ¶¶ 57-58.)

Based on this record, Plaintiff cannot support deliberate indifference claims against Defendants, and the Court will grant summary judgment to Defendants.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Disposition of their Motion for Summary Judgment (Doc. 47) and Defendants' Motion for Summary Judgment (Doc. 44).

(2) Defendants' Motion for Summary Disposition of their Motion for Summary Judgment (Doc. 47) is **denied**.

(3) Defendants' Motion for Summary Judgment (Doc. 44) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 17th day of September, 2018.

David G. Campbell
Senior United States District Judge